UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HUGH E, GUNDER, JR.,               :
                                   :
         Plaintiff                 :      CIVIL NO. 4:11-CV-00300
                                   :
     vs.                           :      (Judge Conaboy)
                                   :
MICHAEL J. ASTRUE,                 :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
         Defendant                 :

MEMORANDUM AND ORDER

BACKGROUND

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Hugh E. Gunder's claim for social security
disability insurance benefits and supplemental security income
benefits.  For the reasons set forth below we will affirm the
decision of the Commissioner.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Gunder met the insured status requirements of the

Social Security Act through September 30, 2011. Tr. 17, 19 and 128.[1]

       Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

       Gunder was born in the United States on May 5, 1961. Tr. 30, 107, 111 and 128.  Gunder completed the 11th grade in 1979 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 37, 131 and 138.  During his elementary and secondary schooling, he attended regular education classes. Tr. 138.  At some point after withdrawing from high school, Gunder obtained a commercial driver's license.  Tr. 34 and 138.  Gunder held several jobs which can be considered past relevant employment.[2]  Gunder has an employment history of unskilled to semiskilled, light to heavy work[3] as a tractor

---

1.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on April 18, 2011.

2.  Past relevant employment in the present case means work performed by Gunder during the 15 years prior to the date his claim for disability benefits was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3.  The terms sedentary, light, medium, heavy and very work are defined in the regulations of the Social Security Administration as follows:

      (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting
                          (continued...)

trailer driver, dump truck driver, front-end loader operator and

---

3.   (...continued)
        or carrying articles like docket files, ledgers, and
        small tools.  Although a sedentary job is defined as
        one which involves sitting, a certain amount of walking
        and standing is often necessary in carrying out job
        duties.  Jobs are sedentary if walking and standing are
        required occasionally and other sedentary criteria are
        met.

        (b) *Light work*.  Light work involves lifting no more
        than 20 pounds at a time with frequent lifting or
        carrying of objects weighing up to 10 pounds.  Even
        though the weight lifted may be very little, a job is
        in this category when it requires a good deal of
        walking or standing, or when it involves sitting most
        of the time with some pushing and pulling of arm or leg
        controls.  To be considered capable of performing a
        full or wide range of light work, you must have the
        ability to do substantially all of these activities.
        If someone can do light work, we determine that he or
        she can also do sedentary work, unless there are
        additional limiting factors such as loss of fine
        dexterity or inability to sit for long periods of time.

        (c) *Medium work*.  Medium work involves lifting no more
        than 50 pounds at a time with frequent lifting or
        carrying of objects weighing up to 25 pounds.  If
        someone can do medium work, we determine that he or she
        can do sedentary and light work.

        (d) *Heavy work*.  Heavy work involves lifting no more
        than 100 pounds at a time with frequent lifting or
        carrying of objects weighing up to 50 pounds. If
        someone can do heavy work, we determine that he or she
        can also do medium, light, and sedentary work.

        (e) *Very heavy work*.  Very heavy work involves lifting
        objects weighing more than 100 pounds at a time with
        frequent lifting or carrying of objects weighing 50
        pounds or more.  If someone can do very heavy work, we
        determine that he or she can also do heavy, medium,
        light and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

3

forklift operator.  Tr. 54-55 175 and 178-181.

Records of the Social Security Administration reveal that Gunder had earnings in the years 1978 through 1980, 1982 through 1990, and 1992 through 2007. Tr. 121.  During the years 1978 through 1980 Gunder's yearly income was less than $3200.00; during the years 1982 through 1990, his yearly income was less than $22,000.00; and during the years 1992 through 2007 his yearly income was less than $31,000.00 Id.  During the last 15 years Gunder was employed his earnings were as follows:

| | |
|---|---:|
| 1993 | $  668.75 |
| 1994 | 5317.08 |
| 1995 | 1824.64 |
| 1996 | 3567.63 |
| 1997 | 12289.51 |
| 1998 | 10889.40 |
| 1999 | 12145.40 |
| 2000 | 23181.08 |
| 2001 | 30871.09 |
| 2002 | 9096.00 |
| 2003 | 3446.28 |
| 2004 | 4349.47 |
| 2005 | 9381.48 |
| 2006 | 16475.15 |
| 2007 | 7595.98 |

Id.  Gunder's total earnings from 1978 through 2007 were $231,282.61. Id.

Gunder claims that he became disabled on August 1, 2007,[4] because of sensory neuropathy of the lower extremities,[5]

---

4.  Gunder, who was 46 years of age on his alleged disability onset date, was considered a "younger individual" under the Social Security regulations. 20 C.F.R. § 404.1563(c). The Social
(continued...)

lumbar disc disease, and obesity.[6] Doc. 7, Plaintiff's Brief, p.

---

4.   (...continued)
Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  Younger individuals can more readily adjust to other work. Id.

5.   "Neuropathy is a collection of disorders that occurs when nerves of the peripheral nervous system (the part of the nervous system outside of the brain and spinal cord) are damaged.  The condition is generally referred to as peripheral neuropathy, and it is most commonly due to damage to nerve axons [nerve fibers]. Neuropathy usually causes pain and numbness in the hands and feet. It can result from traumatic injuries, infections, metabolic disorders, and exposure to toxins. One of the most common causes of neuropathy is diabetes.  Neuropathy can affect nerves that control muscle movement (motor nerves) and those that detect sensations such as coldness or pain (sensory nerves). In some cases – autonomic neuropathy – it can affect internal organs, such as the heart, blood vessels, bladder, or intestines. Pain from peripheral neuropathy is often described as a tingling or burning sensation. There is no specific length of time that the pain exists, but symptoms often improve with time – especially if the neuropathy has an underlying condition that can be cured.  The condition is often associated with poor nutrition, a number of diseases, and pressure or trauma, but many cases have no known reason (called idiopathic neuropathy)." Medical New Today, What is Neuropathy? Neuropathy Causes and Treatments, http://www.medicalnewstoday.com/articles/147963.php (Last accessed February 7, 2012). The Mayo Clinic website indicates that "[i]n many cases, peripheral neuropathy symptoms improve with time – especially if the condition is caused by an underlying condition that can be treated. A number of medications often are used to reduce the symptoms of peripheral neuropathy." Peripheral neuropathy, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/peripheral-neuropathy/DS00131 (Last accessed February 7, 2012).

6.   In August of 2007, Gunder weighed 265 pounds and his height without shoes was 6 feet, 1 inch. Tr. 131. An individual of such height and weight has a body mass index of 35 and is considered obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/ assessing/bmi/adult_bmi/english_bmi_calculator/bmi_ calculator.html (Last accessed February 7, 2012). "Doctors often
(continued...)

1; Tr. 132.  Gunder claims that his toes and feet go numb and are painful. Id.  He further alleged that "[w]ith driving trucks I have to put a lot of pressure on my toes and feet, and that makes it very painful for me. I cannot stand for long periods, because my feet hurt entirely too much." Id.  Gunder does not contend that he is disabled because of a psychiatric impairment. Id.  Gunder stopped working on August 1, 2007. Id.  There is no triggering event, i.e., accident or injury, for Gunder's alleged disabling impairments.  Gunder stated that he "stopped working because [his] condition was not getting any better even after taking some time off to try to let it heal." Id.

On September 5, 2007, Gunder protectively filed[7] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 29, 107-118, 128 and 164.  On November 7, 2007, the Bureau of Disability

---

6.  (...continued)
use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese. Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when [the person has] a BMI of 40 or more. With morbid obesity, [the person is] especially likely to have serious health problems." Obesity, Definition, Mayo Clinic Staff, MayoClinic. com, http://www.mayoclinic.com/health/obesity/DS00314 (Last accessed February 7, 20120).

7.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

Determination[8] denied Gunder's applications. Tr. 67-75.   On November 23, 2007, Gunder requested a hearing before an administrative law judge. Tr. 76.   Approximately 12 months later, a hearing commenced on November 19, 2008, before an administrative law judge. Tr. 27-63.   On December 17, 2008, the administrative law judge issued a decision denying Gunder's applications. Tr. 17-26.   On January 6, 2009, Gunder requested that the Appeals Council review the administrative law judge's decision. Tr. 9-10.   After about 24 months, the Appeals Council on January 29, 2011, concluded that there was no basis upon which to grant Gunder's request for review. Tr. 5-8.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On February 11, 2011, Gunder filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him disability insurance benefits and supplemental security income benefits.  The Commissioner filed an answer to the complaint and a copy of the administrative record on April 18, 2011.  Gunder filed his brief on June 2, 2011, and the Commissioner filed his brief on July 1, 2011.  The appeal[9] became

---

8.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 67 and 71.

9.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a
(continued...)

ripe for disposition on July 6, 2011, when Gunder elected not to file a reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176

---

9.  (...continued)
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.   Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.   Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income

10

claims.   See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,

474 F.3d at 91-92.  This process requires the Commissioner to

consider, in sequence, whether a claimant (1) is engaging in

substantial gainful activity,[10] (2) has an impairment that is

severe or a combination of impairments that is severe,[11] (3) has

an impairment or combination of impairments that meets or equals

---

10.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

11.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20

---

12.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

13.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

12

C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an

individual is still able to do despite the limitations caused by

his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's

decision and the arguments of counsel, we will review some of

Gunder's medical records.  We will commence by reviewing medical

records that pre-date Gunder's alleged disability onset date of

August 1, 2007.

On June 18, 2007, Gunder had an appointment with J.

Chris Acol, M.D., at which Gunder complained of "numbness in his

feet, especially the left foot." Tr. 243.  The "tingling" was on

the "lateral aspect of the foot." <u>Id.</u>  Gunder did not "recall any

trauma to the feet." <u>Id.</u>  Gunder did not "complain of any

weakness, but sometimes he just feels some difficulty feeling

things."  Gunder had no other complaints. <u>Id.</u>  A physical

examination revealed that Gunder's feet were warm to touch, had

"[g]ood capillary refill," "[g]ood [dorsalis pedis][14] and

_____

14.  The pulse felt at the top of the foot.

[posterior tibial][15] pulses," and "proprioception[16] and sensation" appeared "intact" on the right foot. Id.  It was stated that with respect to the lateral aspect of the left foot the ability to distinguish when either stroked or poked was "somewhat decreased." Id.  Dr. Acol's assessment was "paresthesias[17] of the feet bilaterally." Id.  Dr. Acol also noted the possibility of "tarsal tunnel."[18]

On July 8, 2007, Gunder visited the emergency department of the Chambersburg Hospital complaining of numb feet for the past year which had increased in intensity over the last 3 months. Tr. 191 and 261.  Gunder reported that he had seen his family doctor numerous times and was taking Lyrica,[19] but complained that the

_____

15.  The pulse felt behind the medial ankle bone.

16.  Proprioception is the sense of how our bodies are positioned. Proprioceptive is defined as "receiving stimuli within the tissues of the body, as within muscles and tendons." Dorland's Illustrated Medical Dictionary, 1366 (27th Ed. 1988).

17.  Paresthesia is a sensation of tingling, prickling, or numbness of the skin, more generally known as the feeling of pins and needles. See Dorland's Illustrated Medical Dictionary, 1232 (27th Ed. 1988).

18.  Tarsal tunnel syndrome (tibial nerve dysfunction) is the loss of movement or sensation in the foot from damage to or compression of the tibial nerve.

19.  "Lyrica (pregabalin) is an epileptic drug, also called an anticonvulsant. It works by slowing down impulses in the brain that cause seizures. Lyrica also affects chemicals in the brain
(continued...)

drug was causing some adverse reactions and was not working. Id.
On examination, the only abnormality observed was slightly
decreased sensation on the bottom of the feet. Id.  With respect
to Gunder's lower extremities, it was specifically noted that
Gunder had warm feet; good capillary refill; no signs of
ulceration; good flexion and extension; good pulses; normal motor
strength (5/5); normal reflexes; and no cyanosis, clubbing or
edema. Id.  The diagnosis of John L. Bush, M.D., the emergency
department physician, was that Gunder suffered from an "acute
exacerbation of chronic peripheral neuropathy." Id.  Dr. Bush
advised Gunder to follow-up with his family physician to see if
some other drug could be prescribed "which may help with [his]
nerve pain." Id.

    The day after visiting the emergency department at the
Chambersburg Hospital, Gunder had an appointment with
Bridget A. Hilliard, M.D., complaining of numb and painful feet.
Tr. 246.  Dr. Hilliard in the report of that appointment stated in
pertinent part as follows: "Mr. Gunder had seen Dr. Acol back in
June [of] this year who told him that he had paresthesias of the

---

19.  (...continued)
that send pain signals across the nervous system. Lyrica is . . .
used to treat pain caused by nerve damage in people with diabetes
(diabetic neuropathy). . . ." Lyrica, Drugs.com,
http://www.drugs.com/lyrica.html (Last accessed February 8,
2012).

feet on both sides.  He thought it was probably tarsal tunnel
syndrome.  Apparently he has been following up with Dr. Rosenthal
but he thinks there is something additional going on at this
point. Dr. Acol did give him a lab slip.  The patient is just
getting those done today. He points mainly to his toes and the
dorsal and ventral surfaces of his feet. It is 'like a Novocaine
feeling.' He also experiences pain too, especially towards the
toenails.  At times he will have a burning sensation in the
plantar aspect [soles] of his feet as well. The review of systems
is otherwise negative for . . . ." Id.  Dr. Hilliard's physical
examination of Gunder was essentially normal other than
"paresthesias" of the feet, including a finding that Gunder had a
normal gait and normal strength in the lower extremities. Id.
Dr. Hilliard's assessment was that Gunder suffered from
"[p]aresthesias of the feet" and "[p]ossibly a peripheral
neuropathy presentation." Id.

        On July 14, 2007, Gunder arrived ambulatory at the
emergency department of Waynesboro Hospital with complaints of
bilateral foot pain. Tr. 212.  The time was 10:05 p.m. Tr. 215.  A
physical examination was essentially normal. Tr. 213.  Gunder did
have an antalgic gait. Id.  However, there was no indication that
he could not adequately ambulate. Id.  His lower extremities were
non-tender and without edema. Id.  He had no vascular compromise

16

and his pulses were full and equal. Id.  Gunder was discharged
from the hospital at 11:05 p.m. with instructions to follow-up
with his family physician for an MRI of his back. Tr. 217-218.

On July 20, 2007, it appears that Gunder was given a
prescription for Percocet.  Tr. 247.

On July 23, 2007, Gunder had an MRI of the lumbar spine
performed at Waynesboro Hospital which revealed the following: (1)
at the L1-2 through the L3-4 levels no significant abnormalities;
(2) at the L4-5 level mild disc space narrowing and a small
diffuse bulge; and (3) at the L5-S1 level mild disc space
narrowing, disc dehydration, a small right paracentral disc
herniation measuring 5 mm in the anterior posterior diameter
causing no nerve root compression or central spinal stenosis, and
mild bilateral facet degeneration and hypertrophy. Tr. 209.

On July 25, 2007, Gunder received a referral to physical
therapy.  Tr. 247.

On July 30, 2007, Gunder had an appointment with Robert
B. George, M.D., complaining of bilateral foot pain and numbness.
Tr. 362.  A physical examination was essentially normal (i.e., no
masses, no tenderness, femoral pulses equal, and pulses equal in
both feet).  Id.  Dr. George did note that Gunder was obese and
that stiffness prevented Gunder from engaging in straight leg
raising beyond 30 degrees. Id.  Dr. George also noted that it was

17

"[d]ifficult to actually tell where the numbness is. It seems to be the bottom of the feet, both lateral sides of the feet. No[t] up in the ankles themselves. He is able to feel me moving his toes but says that it just feels numb." Id.  Dr. George stated that the MRI of Gunder's back "showed a small disc [herniation]" which was "really nothing that would cause the symptoms that he has . . . especially since his symptoms are in both feet. Sugars are normal. Thyroid has been normal.  Need to check a B12 level.  Recommend we have a neurologist evaluation . . . He is going to use the Percocet occasionally. He is going to take the week off[.]" Id.

The result of the B12 blood test was within the normal range. Tr. 198.

On August 3, 2007, it appear that Dr. George completed a Companion Life, Disability Insurance Claim Form on behalf of Gunder. Tr. 279-280.  Dr. George checked a box on the form which stated that Gunder had a "severe limitation of functional capacity" and was "incapable of minimal (sedentary) activity." Id. Dr. George certified that Gunder was disabled from July 30, 2007 through August 22, 2007, less than a month because of "numbness." Id.  No supportive physical examination or diagnostic findings were enumerated by Dr. George on the form other than the MRI of July 23, 2007. Id.

18

On August 22, 2007, Jeffrey R. Donat, M.D., a neurologist, located in Chambersburg, examined Gunder. Tr. 300-301.  In the report of this examination, Dr. Donat stated that Gunder "is a little vague with details and has trouble dating the onset." Id.  Gunder told Dr. Donat that "the podiatrist removed the nail of his left second toe a month or so ago" and that "[s]ubsequently, he developed pain and numbness of the toes" which "spread up into the feet and distal legs." Id.  Dr. Donat noted significant loss of pin prick sensation up to the lower leg and loss of vibratory sense in the toes. Id. Dr. Donat stated that Gunder "walks gingerly due to pain" and that "he can get up on heels and toes."[20] Id.  Dr. Donat's assessment was that Gunder suffered from "a subacute sensory neuropathy affecting all sensory modalities" of an unclear etiology. Id.  Dr. Donate ordered various diagnostic tests (including electromyography and blood

---

20.  The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed February 9, 2012).

tests), prescribed the drug Neurontin[21] and scheduled a follow-up appointment in one month. Id.

Gunder had the follow-up appointment with Dr. Donat on September 24, 2007. Tr. 302-303.  The report of that appointment reveals that electrodiagnostic testing confirmed that Gunder suffered from a sensory neuropathy but that all other diagnostic tests were essentially negative, including the Lumbar MRI. Id.; Tr. 286-291.  A physical examination revealed that Gunder had a normal extensor digitorum brevis (EDB) muscle (the muscle on the upper surface of the foot) and could abduct (extend) his toes; reflexes were present in both knees but ankle jerk reflexes were absent; pain sense was absent in the feet; vibratory sense was present but blunted to the knees; joint sense was normal; and Gunder walked with a limp but could get up on his heels and toes. Id.  In the impression section of his report of this appointment Dr. Donat stated as follows: "He has sensory neuropathy of axonal type affecting small fibers more severely.[22] The cause of this

_____

21.  "Neurontin (gabapentin) is an anti-epileptic medication, also called an anticonvulsant. . . Neurontin is used . . . to treat seizures caused by epilepsy . . . [It] is also used in adults to treat nerve pain . . . ." Neurontin, Drugs.com, http://www.drugs.com/neurontin.html (Last accessed February 9, 2012).

22.  "Small fiber sensory neuropathy (SFSN) is a disorder in which only the small sensory cutaneous nerves are affected. The majority of patients experience sensory disturbances that start
(continued...)

isn't clear. As is often the case, extensive testing has been negative." Id.  Dr. Donat gave Gunder a prescription for Lyrica "in increasing doses" and stated that if that did not "work we will have to try narcotics." Id.

On October 1, 2007, Dr. Donat completed in part  a Medical Source Statement of Gunder's ability to perform work-related physical activities. Tr. 296-297.  Dr. Donat did not specify Gunder's lifting and carrying abilities; stated that Gunder could walk or stand for one hour or less because of "sensory neuropathy [with] severe pain in feet;" stated that Gunder had no limitations with respect to sitting; did not specify

---

22.   (...continued)
in the feet and progress upwards. . . The symptoms of small fiber sensory neuropathy are primarily sensory in nature and include unusual sensations such as pins-and-needles, pricks, tingling and numbness. Some patients may experience burning pain or coldness and electric shock-like brief painful sensations. Since SFSN usually does not involve large sensory fibers that convey balance information to the brain or the motor nerve fibers that control muscles, these patients do not have balance problems or muscle weakness. . . . Treatment of SFSN depends on the underlying etiology . . . Painful sensory paresthesias can be treated with ant-seizure medications such as gabapentin (Neurontin), pregabalin (Lyrica) and topiramate (Topamax), antidepressants such as amitriptyline (Elavil) and duloxetine (Cymbalta), or analgesics including opiate drugs."  Small Fiber Sensory Neuropathy, Neurology and Neurosurgery, Johns Hopkins Medicine,http://www.hopkinsmedicine.org/neurology_neurosurgery/co nditions_main/old/small_fiber_sensory_neuropathy.html (Last accessed February 9, 2012). John Hopkins Hospital and School of Medicine "uses one overarching name – John Hopkins Medicine – to identify its entire medical enterprise." About John Hopkins Medicine, http://www.hopkinsmedicine.org/about/ (Last accessed February 9, 2012).

any pushing or pulling limitations; stated that Gunder could never balance or climb because of "sensory neuropathy [with] impaired balance;" stated that Gunder had no reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling, and continence limitations; and stated that Gunder had no environmental limitations.  Id.

Also, on October 1, 2007,  Dr. Donat issued a "To Whom it May Concern" letter which stated in toto as follows: "Mr. Hugh Gunder has a peripheral neuropathy involving sensory fibers. This is causing sensory loss and severe pain and tenderness in the feet.  The diagnosis is based on loss of reflexes and impaired sensation in the feet and has been confirmed by abnormal Nerve Conduction Studies.  He has great difficulty walking and cannot drive because of the pain in his feet. The condition has been progressive and there is no effective treatment, so outlook is not good.  I believe he will be permanently disabled." Tr. 299.

On October 3, 2007, Dr. Donat completed an "Employability Re-Assessment Form" for the Pennsylvania Department of Public Welfare.  Tr. 304-305.  In that form Dr. stated that Gunder was permanently disabled from any gainful employment because of neuropathy. Id.

22

On October 24, 2007, Dr. Donat's examination of Gunder did not "show much." Tr. 330.  Gunder had some redness of the skin of the feet; no EDB muscle atrophy and he could extend his toes; ankle jerks were present though dull; sensory testing was difficult; vibratory sense was present at the toes though probably diminished; joint sense was normal; and pin prick sensation possibly was reduced. Id.  Dr. Donat "believ[ed]" that Gunder suffered from "small fiber, sensory neuropathy" but also "wondered about 'Erythromelalgia' as an alternative."[23] Id.  In a letter to Dr. George dated October 24, 2007, Dr. Donat stated that he had nothing more to offer Gunder and that Gunder stopped taking each medication he prescribed. Id.  A letter dated November 15, 2007, from Dr. Donat to Dr. George indicates that Gunder stopped seeing Dr. Donat. Tr. 329.  In the letter Dr. Donat further stated that he believed that Gunder suffered from erythromelalgia and that he recommended treatment with aspirin but that he did not believe Gunder "took it." Id.

On November 2, 2007, Dr. George examined Gunder and noted that Percocet was the only medication that helped Gunder's

_____

23.  Erythromelalgia, also known as Mitchell disease, is a rare disorder characterized by episodes of pain, redness, and swelling in various parts of the body, particularly the hands and feet. See Erythromelalgia, National Organization of Rare Disorders, http://www.rarediseases.org/rare-disease-information/rare-disease s/byID/245/viewAbstract (Last accessed February 8, 2012).

foot pain and allowed him to do things around the house. Tr. 361.
Dr. George expressed concern that Gunder was gaining weight and
encouraged him to find something to do such as returning to school
or taking computer classes. Id.

On November 6, 2007, Candelaria Legaspi, M.D., reviewed
the medical evidence of record on behalf of the Bureau of
Disability Determination and concluded that Gunder suffered from
sensory neuropathy but still could lift and carry up to 20 pounds
occasionally and 10 pounds frequently; stand and walk for 2 hours
in an 8-hour workday; sit about 6 hour in an 8-hour workday; and
occasionally perform postural activities. Tr. 306-312.  Dr.
Legaspi concluded that Gunder had no manipulative, visual or
environmental limitations. Id.

On December 17, 2007, Gunder was examined by Lucille
Andersen, M.D., an orthopedic surgeon, at Hershey Medical Center.
Tr. 317-318.  Dr. Andersen noted that Gunder was "complaining of
bilateral foot pain, numbness and tingling . . . primarily in the
bottom of his feet." Id.  After performing a physical examination
and reviewing radiographs, Dr. Andersen concluded that Gunder
suffered from "[b]ilateral plantar fascitis[24] [sic] and also a

---

24.  "The plantar fascia is a thick band of connective tissue
that originates at the heel bone and runs the entire length of
the sole. It helps maintain the arch system of the foot and plays
a role in your balance and phases of your gait. An injury to this
                                              (continued...)

small component of back radiculopathy."   Dr. Andersen gave Gunder

a cortisone injection, referred Gunder to a Pain Management Clinic

and gave him a prescription for physical therapy. Id.  Gunder was

also advised to try Advil on a regular basis for the next two

weeks. Id.   A follow-up appointment in two months was scheduled.

Id.

On January 17, 2008, Gunder had an appointment with Ali

Yousufuddin, M.D., a pain management specialist, at Chambersburg

Hospital. Tr. 338-339.  Dr. Yousufuddin's physical examination of

Gunder revealed no tenderness and adequate range of motion in the

low back, a negative straight leg raising test bilaterally, and

grossly intact motor strength in the lower extremities. Id.  Dr.

Yousufuddin did find decreased sensory response to soft touch on

the top of the toes and the plantar surface of both feet. Id.  Dr.

Yousufuddin's assessment was that Gunder suffered from

---

24.  (...continued)
tissue, known as plantar fasciitis, can require physical therapy
. . . Plantar fasciitis is a painful inflamation . . . [and] is
usually found in only one foot. Bilateral plantar fasciitis, on
the other hand, is probably the result of a systemic arthritic
condition." Is a stationary bike good exercise when you have
plantar fascitis? Livesstrong.com, http://www.livestrong.com/
article/335125-is-a-stationary-bike-good-exercise-when-you-have-p
lantar-fasciitis/ (Last accessed February 8, 2012). Someone who
is obese has a significant risk factor for plantar fasciitis. The
epidemiology of plantar fasciitis. Capt. Danielle L. Scher, M.D.,
et al., Lower Extremity Review, http://www.lowerextremityreview.
com/article/the-epidemiology-of-plantar-fasciitis (Last accessed
February 8, 2012).

"[b]ilateral foot pain, possible bilateral peripheral neuropathy of unknown origin." Id.  He noted that Neurontin and Lyrica "were not tolerated by" Gunder and prescribed Trileptal[25] and advised Gunder that he could continue taking Percocet as needed. Id.

On January 18, 2008, Gunder had an appointment with Dr. Donat. Tr. 328.  Dr. Donat in a letter to Dr. George on that same day reviewed his findings. Id.  Dr. Donat noted that Gunder continued to complain of numbness of the feet and aching, burning and sharp pain. Id.  The physical examination revealed that Gunder's "[f]eet look a little red. They are dry and slightly warm. There are no trophic changes. EDB muscles are not atrophic[26] and he can abduct his toes.  Left ankle jerk is normal though dull and right is trace. Vibration is present though reduced. Joint sense is normal on the right and reduced on the left. Cold sensation is blunted in the toes. Pain sense is definitely

---

25.  "Trileptal (oxcarbazepine) is in a group of drugs called anticonvulsants, or antepileptic drugs. It works by decreasing nerve impulses that cause seizures." Trileptal, Drugs.com, http://www.drugs.com/trileptal.html (Last accessed February 9, 2012).

26.  Trophic changes result from the interruption of a nerve supply or peripheral nerve lesion and are manifested by abnormalities of the skin, hair, nails, or bone. Atrophy is "a wasting away; a dimunition in the size of a cell, tissue, organ or part." Dorland's Illustrated Medical Dictionary, 165 (27th Ed. 1988). Atrophic is "pertaining to or characterized by atrophy." Id.

impaired to mid foot.  He walks with a limp." _Id._  Dr. Donat
rejected his prior erythromelalgia diagnosis and concluded that
Gunder suffered from "small fiber sensory neuropathy." _Id._  Dr.
Donat stated that "[a]s is often the case, extensive evaluation
has been negative as to cause, it is 'idiopathic.' We could biopsy
the nerve, or look at other tissues, for amyloid[27] but I doubt the
value here." _Id._  Dr. Donat also noted that Gunder "[i]n the past
has quit every medicine I have given him after a day or so. He
states that he is unwilling to tolerate any side effects. This is
unreasonable." _Id._ (emphasis added).  Dr. Donat gave Gunder a
prescription for Elavil. _Id._

        On January 22, 2008, Gunder was examined by Brenda K.
Oatman, M.D., at the emergency department of Chambersburg
Hospital. Tr. 334-335.  Gunder went to the Chambersburg Hospital
because he was unable to obtain an appointment with his family
doctor. _Id._  A physical examination of Gunder by Dr. Oatman
revealed no calf swelling or deformity and normal color and warmth
in his legs; normal pulses at the ankles and the feet; normal
appearing feet; no edema, erythema, skin change or breakdown; no

---

27.  Amyloid is a protein that when deposited in tissue in
abnormal amounts (amyloidosis) can cause, inter alia, numbness,
tingling, weakness and swelling. See William C. Shiel, Jr., M.D.,
Amyloidosis, MedicineNet.com, http://www.medicinenet.com/
amyloidosis/article.htm (Last accessed February 8, 2012).

palpable tenderness or mass; and full range of motion in the legs, feet and toes. <u>Id.</u>  Gunder did report a dull sensation and numbness in the plantar surface of both feet. <u>Id.</u>  In the emergency room report Dr. Oatman stated: "I explained to him that I am really not sure what to add.  He has had many evaluations up to this point by specialists who are better to diagnose and treat such a problem.  Unfortunately, he has never taken any of the medicines prescribed for more than a couple of doses, even the most recent he just took one dose due to some apparent intolerance or generally [sic] dislike of potential adverse reactions. I tried to reach Dr. Acol, unfortunately the office was closed, and he apparently was not in today.  The patient states he will see him on Friday as planned.  At this point, I do not have any other recommendations to make except to keep the followups and to consider taking the medicines or giving them another trial." <u>Id.</u>

On February 1, 2008, Gunder had an appointment with Dr. Acol. Tr. 360.  Dr. Acol in the notes of that appointment stated in part as follows: "Mr. Gunder comes back to the office after being seen by Dr. George.  Apparently, he has left the practice because of this foot pain, and he has returned because, I guess, he did not feel that he was getting better.  Unfortunately, I do not know if there is anything I can really tell him." <u>Id.</u>  Dr. Acol's objective findings were unremarkable other than he did note

weak pulses in the feet, blanching of the skin on palpation of the feet and that feet "are cool to touch, but they have good color." Id.  Dr. Acol's assessment was "[b]ilateral foot pain of unknown etiology." Id.  Dr. Acol ordered "an arterial study just to make sure that there [was] no blood flow problem" and an electromyography (EMG). Id.  He also continued Gunder's prescription for Percocet, started Gunder on Cymbalta and scheduled a follow-up appointment in 3 weeks. Id.

On February 10, 2008, Gunder visited the emergency department at Chambersburg Hospital complaining of pain in both feet and chest pain.  Tr. 332.  A physical examination performed by James W. Freeman, M.D., the emergency department physician was essentially normal, including Gunder had normal strength (5/5) in his lower extremities. Id.  Gunder did have diminished sensation to light touch in both feet. Id.  An ECG was normal. Id.  Dr. Freeman's assessment was that Gunder had "[a]cute atypical chest pain" and an "[a]cute exacerbation of persistent bilateral lower extremity peripheral neuropathy." Id.  Dr. Freeman administered morphine which gave Gunder "some relief." Id.  Dr. Freeman discharged Gunder from the hospital with instructions to follow-up with Dr. Acol and Dr. George regarding the chest pain.  He also advised Gunder that he could take 2 Percocet at a time every 4 hours with food as needed for pain. Id.

On February 20, 2008, Gunder had an arterial study of his lower extremities which was normal, i.e., it revealed "no evidence of significant arterial occlusive disease in either lower extremity." Tr. 371.

On February 27, 2008, Gunder had an appointment with Dr. Acol at which Gunder complained of "continuing bilateral foot pain with the left greater than the right." Tr. 359.  Dr. Acol noted that Gunder had "been worked up by Dr. Donat for possible autoimmune disease,[28] and he does have a positive ANA,[29] but a

---

28.  "An autoimmune disease is a condition that occurs when the immune system mistakenly attacks and destroys healthy body tissue."  Autoimmune disorder, MedlinePlus, A service of the U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus /ency/article/000816.htm (Last accessed February 10, 2012). An example of an autoimmune disease is Rheumatoid arthritis. Id.

29.  "ANA" is an abbreviation for antinuclear antibodies. The Mayo Clinic website describes the ANA test as follows:

> An ANA test detects antinuclear antibodies in your blood. Your immune system normally makes antibodies to help you fight infection.  In contrast, antinuclear antibodies often attack you body's own tissues – specifically targeting each cell's nucleus.
>
> In most cases, a positive ANA test indicates that your immune system has launched a misdirected attack on your own tissue – in other words, an autoimmune reaction. But some people have positive ANA even when they're healthy.

ANA Test, Definition, Mayo Clinic staff, http://www.mayoclinic. com/health/ana-test/MY00787 (Last accessed February 10, 2012).

ratio of 1:80.[30] We are going to go ahead and see if we can get a more recent ANA to see if there is anything going on there. All other systems are negative." Id.  The physical examination of Gunder was essentially normal except Dr. Acol noted that Gunder could not "walk on his heels or toes because of pain." Id.  Dr. Acol's assessment was "[p]ossible Autoimmune Disease, but the ratio is somewhat equivalent." [sic][31] Dr. Acol ordered a repeat ANA blood test and referred Gunder to a physical therapist for an evaluation and treatment and gave him samples of an "NSAID[32] patch and a Lidocaine patch to see if any of those would be able to give

---

30.  This ratio is the titer of the ANA test. "The titer is a ratio that expresses the number of times the technician had to dilute the plasma from the blood before the antibodies could no longer be detected . . . Titers of 1:20 and 1:40 or less are generally considered normal depending on the lab and methods used to conduct the test. . . [A] titer of 1:40 would mean that the antibodies were last detected when 1 part of the blood was diluted with 40 parts of either water or saline.  The higher the second number the higher the concentration of antibodies." ANA Test & Lupus, Cure4Lupus.org, http://cure4lupus.org/store/index.php?main_page=page&id=167&chapter=1 (Last accessed February 10, 2012); see also Antinuclear antibody panel, MedlinePlus, A service of the U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/003535.htm (Last accessed February 10, 2012).

31.  We believe that Dr. Acol meant "equivocal" instead of "equivalent."

32.  "NSAID" is an abbreviation for nonsteroidal anti-inflammatory drug.

him some kind of relief from his pain." Id.  The results of the

repeat ANA blood test were negative. Tr. 402.

Gunder was evaluated by Tammy M. Kegerreis, a physical

therapist, on February 29, 2008. Tr. 368-369.  The report of that

evaluation states in pertinent part as follows: "He has decreased

sensation to light touch and sharp/dull with testing today in the

bilateral feet, worse near his toes which he reports are numb all

the time.  Sensation changes are not present in any particular

dermatonal or nerve root pattern,[33] just seems to be worse at the

toes vs. remainder of foot, similar to neuropathy commonly seen in

the feet.  Noticed some discoloration and mottling of skin after

sitting with shoes/socks off during evaluation today. [Gunder] has

good lumbar [active range of motion] and reports minimal to no

back pain. Strength in bilateral lower extremities is normal with

manual muscle testing but did have difficulty getting patellar and

achilles reflexes today.  Unable to provoke any change in foot

[symptoms] or pain in the back with any special testing or

positions today. [Gunder] is not a good historian with results of

_____

33.  A dermatone is an area of the skin mainly supplied by a
single spinal nerve, There are 8 such cervical nerves, 12
thoracic, 5 lumbar and 5 sacral. A problem with a particular
nerve root should correspond with a sensory defect, muscle
weakness, etc., at the appropriate dermatone. See Stephen
Kishner, M.D., Dermatones Anatomy, Medscape Reference,
http://emedicine.medscape.com/article/1878388-overview (Last
accessed February 10, 2012).

tests and/or other consultations. Spoke to referring MD regarding eval findings today and we decided to follow with [physical therapy] a few visits to continue to evaluate/monitor [symptoms] while attempting to educate on lumbar stabilization activities." Id.

On March 19, 2008, Gunder had an appointment with Dr. Acol "because of continued foot pain bilaterally." Tr. 358.  Dr. Acol noted that he spoke "with physical therapy and they felt that there really was no evidence of any kind of back issue." Id.  The objective portion of Dr. Acol's notes of this appointment state in part as follows: "He is miserable. He is depressed. He looks very unhappy. He walks very gingerly. He has put on a lot of weight and his blood pressure is up.  I think that is secondary to pain.  He has been on Percocet, which seems to offer some relief, and he takes it every 4 hours.  But this is constant sharp pain.  I am going to give him MS Contin, which is more time-release.  We will start off on a low dose twice a day and see if that helps him . . . . The feet are very tender, forefoot, midfoot and hindfoot." Id. Dr. Acol's assessment was that Gunder suffered from "[b]ilateral foot pain of unknown etiology." Id.

On March 22, 2008, Gunder visited the emergency department at the Chambersburg Hospital complaining of foot pain. Tr. 366.  Gunder's blood pressure was elevated at 189/100 and he

had "tenderness . . . primarily on the plantar surface of his left foot, most prominent at the base of his second toe." Id.  Gunder requested an x-ray of the left foot which revealed "no evidence for any acute bone, joint of soft tissue abnormality." Tr. 370. Gunder was discharged from the hospital with instructions to follow-up with his regular physician. Tr. 366.

On April 2, 2008, Gunder had an appointment with Dr. Acol regarding his "continued foot pain."  Tr. 357.  The subjective portion of Dr. Acol's report of that appointment states in part as follows: "He is having a good day today. He has been slowly switching from the Percocet to Tylenol, and he seems to be responding relatively well to that.  He does exhibit some symptoms associated with possible withdrawal of opiods because he says when he takes the Percocet he does not notice the same relaxation that he did before.  Also, he becomes a little bit anxious.  I educated him about the symptoms of withdrawal, anxiety, and hypertension . . . . He is transitioning from using Percocet to more Tylenol and it seems to be working." Id.  The result of physical examination were essentially normal.  Id.  Gunder did have "some tenderness upon palpation of the lower extremities bilaterally[.]" Id. However, he had "intact proprioception and sensation bilaterally" and "good" pulses in his feet. Id.

On April 7, 2008, Gunder was discharged from physical therapy. Tr. 367.  The discharge summary states in toto as follows: "[Gunder] was seen for three visits in [physical therapy]. He [cancelled] last appointment due to not feeling well due to med changes.  He was to call within two weeks if he wanted to schedule another appointment if he felt it would be helpful. [Gunder] has not called for several weeks therefore will be discharged at this time." Id.

On April 10, 2008, Gunder had an appointment with Vasanth Kumar, M.D., a neurologist, at Cumberland Valley Neurological Consultants, Chambersburg. Tr. 408.  In a letter to Dr. Acol after that appointment Dr. Kumar stated in relevant part as follows:

> On clinical examination he is [alert, awake and oriented], somewhat big build, but . . . markedly obese . . . Lower extremity examination basically shows diminution of reflexes, both knee/ankle. Touch and vibration sensation seems to be intact at this point. His joint position is also intact.
>
> I have seen his MRI and it shows a bulge at 4-5 and L5-S1 and this should not cause any radicular symptoms and he does not have any radicular symptoms at this point.  I understand he has had a lot of blood work in the hospital and electrodiagnostic studies by Dr. Cho.  I have told him to go ahead and get these reports and set up an [appointment] to see Dr. Sollenberger to see if he can help him out. From my point of view there is nothing neurosurgically that I can do . . . if the diagnosis is peripheral neuropathy as established by Dr. Donat and the MRI shows no surgical lesion.

35

Id.

On July 16, 2008, Gunder was examined by a second neurologist, S.N. Kieran, M.D., at Cumberland Valley Neurological Consultants. Tr. 405-406.  Dr. Kieran's examination of Gunder revealed a "[p]atient in no obvious distress, looking younger than stated age." Tr. 406.  The "motor exam" revealed normal strength (5/5), "normal bulk and tone," and "no trophic changes." Id.  It was stated that Gunder's gait was "narrow based" but that he could "walk well." Id.  Gunder's coordination was intact. Id.  The neurological examination was essentially normal except for "significant stocking/glove distribution sensory loss to pinprick, vibratory, temperature sensation."[34] Id.  Dr. Kieran's assessment was that Gunder suffered from "peripheral neuropathy largely small fiber." Id.  Gunder had a follow-up appointment with Dr. Kieran on August 13, 2008. Tr. 404.  Dr. Kieran's diagnosis was the same. Id.

On August 12, 2008, Dr. Acol completed a questionnaire entitled "Listing Questionnaire: Meets or Medically Equals." Tr.

---

34.  "People [who have peripheral neuropathy] typically describe the pain . . . as tingling or burning, while they compare the loss of sensation to the feeling of wearing a thin stocking or glove." Peripheral neuropathy, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/peripheral-neuropathy/DS00131 (Last accessed February 10, 2012).

373. This questionnaire appears to have been prepared by Gunder's attorney and purports to represent that Dr. Acol found that Gunder met or equaled the requirements/criteria of Listing 11.14, Peripheral Neuropathies.  The only signs, symptoms and medical finding listed by Dr. Acol as supporting a claim that Gunder met Listing 11.14 were as follows: "He has gait abnormality of both lower legs due to sensory disturbances (pain, paresthesias & burning sensations). . . sensory disturbances that interfere w/locomotion." Id.

On August 13, 2008, Gunder had a follow-up appointment with Dr. Kieran.  Tr. 404.   A physical examination revealed that Gunder's strength was intact and his gait was steady. Id.  Dr. Kieran's assessment was that Gunder suffered from "[p]eripheral neuropathy, likely small fiber." Id.

On August 27, 2008, Gunder had an MRI of his right and left foot performed at the Chambersburg Hospital. Tr. 374-375. The MRI of the right foot was "unremarkable." Id.  The MRI of the left foot revealed the following: "There is no evidence of any abnormal bone marrow signal or bone marrow edema.  The visualized musculature demonstrates normal signal.  The visualized tendinous structures appear intact.  There is a 9.5 mm cystic finding seen

dorsally near the medial cuneiform.[35]  This is very nonspecific

but may represent a ganglion type cyst."[36]  Id.

**DISCUSSION**

     The administrative law judge at step one of the

sequential evaluation process found that Gunder had not engaged in

substantial gainful work activity since August 1, 2007, the

alleged disability onset date. Tr. 19.

     At step two of the sequential evaluation process, the

administrative law judge found that Gunder had the following

severe impairments: sensory neuropathy, lumbar disc disease, and

obesity.  Tr. 19.

     At step three of the sequential evaluation process the

administrative law judge found that Gunder's impairments did not

individually or in combination meet or equal a listed impairment.

Tr. 19-20.  In so finding the administrative law judge reviewed

listings 11.14 (Peripheral neuropathies), 1.02 (major dysfunction

---

35.  The medial cuneiform is a wedge-shaped bone in the midfoot
above the big toe.

36.  "Ganglion cysts are noncancerous fluid-filled lumps (cysts)
that most commonly develop along the tendons or joints of your
wrists or hands.  They may also appear in your feet. . . In many
cases, ganglion cysts will cause you no pain and require no
treatment.  Often, they go away on their own. When you do need
treatment for a ganglion cyst . . . it usually consists of
removing the fluid from the ganglion cyst or surgically removing
the cyst."

of a joint(s)), and 1.04 (Disorders of the spine).  The

administrative law judge stated in relevant part:

> The record contains an August 2008 opinion from Dr.
> Acol, a treating physician, indicating the claimant
> meets and medically equals listing 11.14B, based on
> the referenced 11.04B requirements, due to gait
> abnormality due to sensory disturbances with pain,
> paresthesias, and burning sensations. Dr. Acol finds
> that the listing is met/equaled based on sensory
> disturbance that interferes with motor function . .
> . The undersigned concurs that there has been
> persistent sensory deficits of both feet on
> examinations. However, diagnostic studies have showed
> only mild abnormalities suggestive of peripheral
> neuropathy.  MRI's in August 2008 showed normal right
> foot and only a small cyst on the left foot . . .
> Moreover, the record does not establish disabling
> locomotive dysfunction even despite his lumbar
> pathology and obesity.  He has been noted to walk
> gingerly and with a limp due to pain on several
> examinations.  However, there is no evidence of motor
> loss or serious gait impairment.  The claimant has not
> been prescribed a cane.  His treatment has been
> conservative and he reports that his pain is relieved
> only by narcotics, which he reported helps him be able
> to do things around the house.  He is able to carry
> out normal weight bearing and ambulatory activities,
> such as taking care of personal care, driving to and
> attending appointments, and doing some chores and
> shopping.  Accordingly, this opinion was accorded little
> weight.
>
> The record does not show that the claimant's impairments
> are associated with medical findings required to meet
> Listing 1.02A or 1.04A.  The claimant does not have
> evidence of nerve cord compression, motor loss, or an
> inability to ambulate effectively.  An MRI performed on
> July 23, 2007 showed evidence of degenerative disc
> disease and a right disc herniation at L5-S1 . . .
> However, Dr. Vasantha Kumar, a neurosurgeon, reported
> in April 2008 that these findings should not cause
> radicular symptoms and that he did not have any
> radicular symptoms at that point. The most recent

examination, in August 2008, stated strength is intact
and gait is steady.

Id.

At step four of the sequential evaluation process the
administrative law judge found that Gunder could not perform his
past relevant light to heavy work but Gunder had the residual
functional capacity to perform a limited range of unskilled,
sedentary work. Tr. 20-24.  Specifically, the administrative law
judge found that Gunder could perform sedentary work

except that he requires a sit/stand option. He should
never be required to perform activities requiring the
operation of foot controls, levers, or pedals or working
around vibrating objects or surfaces with the bilateral
lower extremities.  He should never be required to
crawl or climb ropes, ladders, or scaffolding.  He
should not work in high exposed places, or around fast
moving machinery on the ground.  He is limited to
occasional balancing, stooping, kneeling, and climbing
stairs.  He is limited to occasional exposure to extreme
heat or cold.  Finally, he is limited to simple,
unskilled work.  This residual functional capacity
specifically considers the effects of pain and
medications.

Tr. 20.  In arriving at this residual functional capacity the
administrative law judge found that Gunder's statements about his
pain and functional limitations were not credible. Tr. 21-22.  The
administrative law judge also relied on the opinion of Dr.
Legaspi, the state agency physician, and rejected the conclusory
opinion of Dr. Donat that Gunder was permanently disabled. Tr. 24.

At step five, the administrative law judge based on a residual functional capacity of a limited range of sedentary work as described above and the testimony of a vocational expert found that Gunder had the ability to perform unskilled work as a final assembler and a semi-conductor bonder, and that there were a significant number of such jobs in the local, regional and national economies. Tr. 25.

The administrative record in this case is 413 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an adequate job of reviewing Gunder's medical history and vocational background in her decision. Tr. 19-26.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 8, Brief of Defendant.  Gunder's primary argument is that the administrative law judge erred at step three of the sequential evaluation process when the administrative law judge found that Gunder's impairments did not meet or equal the requirements of Listing 11.14 entitled "Peripheral neuropathies." We find no merit in that argument.

Gunder argues that the relevant Listing is 11.14 - Peripheral neuropathies.  Before we address the criteria/requirements of that listing we will mention some basic principles set forth in case law and the regulations of the Social

Security Administration.  If Gunder's severe impairments met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits.  However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d).  To do this a claimant must show that all of the criteria for a listing are met or equaled. Id.  An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one.  Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.  However, an administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence (raw data) in the record. Maddox v. Heckler, 619 F. Supp. 930, 935-936 (D.C.Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 250 (2011).

To satisfy Listing 11.14, Gunder had the burden of proving that he had peripheral neuropathy "[w]ith disorganization of motor function as described in 11.04B, in spite of prescribed treatment." (Emphasis added.) Section 11.04B describes

disorganization of motor function as "[s]ignificant and persistent
disorganization of motor function in two extremities, resulting in
sustained disturbance of gross and dexterous movements, or gait
and station (see 11.00C)." (Emphasis added.)  Section 11.00C
states that "[p]ersistent disorganization of motor function in the
form of paresis or paralysis, tremor, or other involuntary
movements, ataxia and sensory disturbances (any and all of which
may be due to cerebral, cerebellar, brain stem, spinal cord, or
peripheral nerve dysfunction) which occur singly or in various
combinations, frequently provides the sole or partial basis for
decision in cases of neurological impairment.  The assessment of
impairment depends on the degree of interference with locomotion
and/or interference with the use of fingers, hands, and arms."
(Emphasis added.)

From our review of the medical evidence, we cannot
conclude that the administrative law judge acted unreasonably in
rejecting the opinion of Dr. Acol that Gunder's impairments met or
equaled the requirements of Listing 11.14.  There is a lack of
evidence of "significant and persistent disorganization of motor
function."  Gunder is able to ambulate although with difficulty.
He has not been prescribed a cane or other assistive device. He is
able to bear weight on his feet sufficiently to care for his
personal needs, drive, attend appointments, do chores and go

shopping.   Furthermore, the record reveals that he did not follow
prescribed treatment.   Consequently, despite the fact that
Gunder's peripheral neuropathy results in some sensory deficits,
the functional limitations he experiences are insufficient to meet
or equal the requirements of Listing 11.14.

Gunder also argues that the administrative law judge
erred by failing to consider Gunder's allegations of pain and
medication side effects; that substantial evidence does not
support the administrative law judge's finding that Gunder can
engage in sedentary work; and that a remand for further
proceedings is warranted because of new and material evidence.
These arguments also lack merit.

The administrative law judge in her decision explicitly
stated that she considered Gunder's allegations of pain and
medication side effects.   The claim that the administrative law
judge did not consider Gunder's pain allegations and medication
side effects is devoid of merit.

The Commissioner frequently argues that his
administrative law judges have the ultimate responsibility of
fashioning the residual functional capacity of a claimant. It is
clear that an administrative law judge is responsible for making
the ultimate determination regarding residual functional capacity

44

and disability and need not accept a conclusory statement from a treating physician. <u>Chandler v. Commissioner of Soc. Sec.</u>, __F.3d.__, 2011 WL 6062067 (3d Cir. Dec. 7. 2011); 20 C.F.R. §§ 1546(c) and 1527(e). However, a precedential opinion from this Circuit requires medical opinion or evidence supporting the administrative law judge's residual functional capacity assessment, that is, the claimant can perform the lifting, carrying, standing, walking, sitting, etc., requirements of either sedentary, light, medium, heavy or very heavy work on a full-time basis. <u>Doak v. Heckler</u>, 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence.").

Any argument from the Commissioner that his administrative law judges can set the residual function capacity in the absence of medical opinion or evidence must be rejected in light of <u>Doak</u>. Furthermore, any statement in <u>Chandler</u> which conflicts (or arguably conflicts) with <u>Doak</u> is *dicta* and must be disregarded. <u>Government of Virgin Islands v. Mills</u>, 634 F.3d 746, 750 (3d Cir. 2011)(a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel).

Bare medical records without expert medical interpretation are rarely enough to establish a claimant's residual functional capacity. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990). When there is a lack of evidence regarding the functional abilities of a claimant, this court must follow the principles set forth in Doak. However, the present case is not one where there was no medical opinion supporting the administrative law judge's residual functional capacity assessment.

The requirements of Doak were met in the present case. The administrative law judge appropriately rejected the conclusory opinion of Dr. Donat that Gunder was permanently disabled and relied on the opinion of Dr. Legaspi who provided a detailed functional capacity assessment. The administrative law judge's reliance on Dr. Legaspi's opinion was appropriate. Cf. Chandler, at *4, supra ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). Furthermore, although Gunder received treatment after Dr. Legaspi issued her opinion regarding Gunder's functional

46

capacity, the records of that subsequent treatment do not reveal any substantial increase in Gunder's symptoms or change in his condition.  In fact on April 2, 2008, Gunder at an appointment with Dr. Acol reported an improvement in his condition.

Finally, the Commissioner correctly argues that counsel failed to show good cause for counsel's failure to submit the alleged "new and material evidence" to the administrative law judge prior to the administrative law judge issuing a decision. The alleged "new" evidence is a functional capacity assessment prepared by Dr. Acol which is dated December 1, 2008, sixteen days before the administrative law judge issued her decision. In order to justify a remand on the basis of evidence submitted to the Appeals Council after the ALJ issues a decision, a claimant must demonstrate that the evidence is "new" and "material" and also "good cause" for not having incorporated the evidence into the administrative record prior to the ALJ's decision. Matthews v. Apfel, 239 F.3d 589, 592-593 (3d Cir. 2001).  This Gunder has failed to do.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.

We will, therefore, pursuant to 42 U.S.C. § 405(g), affirm the decision of the Commissioner.

        An appropriate order will be entered.


                                S/Richard P. Conaboy
                                RICHARD P. CONABOY
                                United States District Judge

Dated: February 15, 2012